**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joseph J. NEARY, Defendant-Appellant.**

No. 75–1781.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1976.

Decided March 31, 1977.

Rehearing and Rehearing En Banc Denied June 8, 1977.

Thomas D. Decker, Federal Defender Program, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Chicago, Ill., William C. Brown, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and STECKLER, Chief District Judge.*

* Chief District Judge William E. Steckler of the Southern District of Indiana is sitting by designation.

FAIRCHILD, Chief Judge.

On January 28, 1975 the defendant was indicted for concealing and disposing of securities moving in interstate commerce, valued at $5,000 or more, knowing them to have been stolen, in violation of 18 U.S.C § 2315. Under § 2315, the maximum term of imprisonment for this offense is ten years. On April 25, 1975, before trial, the government filed notice of its intention to seek an enhanced sentence under 18 U.S.C § 3575, the dangerous special offender section of Title X of the Omnibus Crime Control Act of 1970. The maximum possible sentence under § 3575 is 25 years.

The defendant was tried by jury and convicted under § 2315. Following trial, the district court conducted hearings as provided under § 3575 and found that the defendant was a special and dangerous offender, and sentenced the defendant to ten years and one day imprisonment. From that conviction and sentence the defendant appeals. We affirm.

The defendant raises the following issues: whether the government properly proved the value of the securities to be in excess of $5,000; whether the trial court erred in denying defendant's motion for a new trial because of alleged incompetence of a juror revealed by events subsequent to verdict; and whether 18 U.S.C § 3575 is unconstitutional on its face or as applied in this case. We find that there was sufficient proof to establish the value of the securities to be greater than $5,000. The facts revealed after trial did not raise any issue of juror competency. Although questions of due process could arise in certain contexts in implementing the provisions of § 3575, the application of the statute did not violate defendant's constitutional rights in this case.

1. In addition to par value, the government offered proof of market value. A stockbroker testified that between the time the certificates were stolen and the time they were recovered from the defendant (July 23 to August 8, 1974), the Kentucky Shares were traded at $2.75 per share, while the American Shares were not traded over the counter. At this figure, the Kentucky Shares alone had a market value of

## I. THE VALUE OF THE SECURITIES

On July 23, 1974 the office of William R. Isaacs in Berea, Kentucky was burglarized. Stock certificates for 21,263 shares of Kentucky Family Security Group Insurance Company (hereafter referred to as Kentucky Shares) and 34,884 shares of American Family Security Group, Inc. (hereafter referred to as American Shares) were taken. On August 8, 1974 the defendant met with an undercover agent of the Federal Bureau of Investigation in Chicago and asked the agent if he had a connection for disposing of stolen securities. After the agent indicated that he might be able to arrange a sale of the securities, the defendant gave him envelopes containing the stock certificates stolen from Mr. Isaac's office in Kentucky. Prosecution under 18 U.S.C § 2315 followed.

The defendant challenges the validity of designating par value of securities as a criterion for the offense charged and raises other arguments with respect to the determination of the market value of the stocks involved.

Value is defined in 18 U.S.C § 2311 as "face, par, or market value, whichever is the greatest . . . ." At trial, the government offered several measures of value of the stock, among them par value.[1] While the American Shares had no par value, the Kentucky Shares had a par value of one dollar per share. Thus, aggregate par value of the Kentucky Shares alone was $21,263.

Defendant concedes that par value greater than $5,000 was established, but asserts that par value is an unreasonable standard of valuation, having no substantial relation to the purpose of the statute. The thrust of defendant's challenge is that par value

$58,473.25. The owner testified that he had listed all the shares for sale for $138,000 shortly before the theft. He further testified that the stocks were registered, that is, they were non-negotiable without his verified signature. After the theft, he placed a stop order on the securities, requesting the companies to notify him if the securities were presented for transfer.

has little or no bearing on the value of a share of stock.

In essence defendant claims that Congress had made an invalid classification among persons concealing and otherwise dealing with stolen securities in commerce, with knowledge of their being stolen. He seems to concede the validity of making the existence of a federal offense depend on market value, but challenges making it depend alternatively on par value.

■ Congress has great latitude, however, in making statutory classifications. A statutory discrimination will not be set aside as violative of equal protection or due process if any state of facts reasonably may be conceived to justify it. *United States v. Weatherford*, 471 F.2d 47, 51 (7th Cir. 1972), *cert. den.*, 411 U.S. 972, 93 S.Ct. 2144, 36 L.Ed.2d 695.

■ In defining the federal offense of concealing and disposing of stolen securities moving as interstate commerce, Congress need not have specified any minimum value, or could have chosen any amount other than $5,000. The purpose of its choice was not really to absolve those who deal culpably with such securities of lesser value, but to impose a limit which would avoid overtaxing the federal justice system. *United States v. Gardner*, 516 F.2d 334, 349 (7th Cir. 1975).

Of course, it could be true in particular instances that securities with a par value of $5,000 or more in fact would be worthless, and dealing with the certificates would be a federal offense under this and related sections. Stock with no par value could have a market value of $4,999 and one dealing with it with knowledge would not be subject to federal prosecution.

■ Perfect logical consistency is not essential. It is only necessary that the standard have some rational relationship to the purpose of protecting interstate commerce, yet limiting the exercise of federal jurisdiction in terms of the significance of the offense.

■ Use of par value has a rational relationship to the purpose to be served. At the time of original issue of stock, most jurisdictions require that the consideration paid into the corporation for shares having par value shall be at least equal to that par value. W. Cary, *Corporations*, p. 1111 (4th ed. 1969). At that point, par value has some relationship to intrinsic value. As time goes by, it becomes less valid an indication. Even though this is true, we think that in seeking to eliminate from federal prosecution the least substantial interference with interstate commerce, a limitation in terms of par value is not so meaningless as to violate standards of due process, including equal protection.

Because par value of the Kentucky Shares exceeded $5,000, and the law making par value a criterion is valid, it is not really necessary to deal with defendant's arguments concerning the proof of market value. *United States v. Weinberg*, 478 F.2d 1351, 1354 (3rd Cir. 1973), *cert. den.*, 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 242.

■ In any event, adequate market value was clearly proved. Defendant argues that although the government proved sales of Kentucky Shares at $2.75 per share, it failed to prove that a block of 21,263 shares could have been sold, or that there were any sales aggregating as much as $5,000. We think proof of the price per share was sufficient to make a *prima facie* case, and there were no facts tending to show that this price could not have been obtained for the shares involved.

■ Defendant also argues that the certificates were not marketable because they were registered and because the owner had placed a stop transfer order on them. We think that in the light of the purpose of this statute, market value is the value of the shares evidenced by the certificates stolen, and is not affected by the fact that forgery would be necessary to transfer them, or that a stop transfer order had been placed by reason of the theft. See *United States v. McMahon*, 548 F.2d 712 (7th Cir., 1977).

## II. COMPETENCE OF THE JUROR

■ During the week following the defendant's trial, a juror who served in the

defendant's case appeared as a member of the panel of prospective jurors in another matter. On *voir dire* examination in the later case, the individual stated that she had served as a juror in a civil case the preceding week. She was evidently referring to defendant's trial. Defendant brought this incident to the attention of the court in his motion for a new trial, but the court declined further inquiry. Defendant contends that this statement reveals that the juror had been incompetent to serve in defendant's case. The argument is that she must not have realized, or perhaps was not capable of realizing, the extent of the government's burden of proof in defendant's case. Perhaps the juror misspoke or recalled the case inaccurately. Her reference to this case as a civil case does not demonstrate that she failed to follow, or was incapable of following the instructions with respect to reasonable doubt and the like.

██ In any event, a juror will not be heard to impeach the verdict by testimony concerning his misconception of the court's

instructions. *United States v. Stacey*, 475 F.2d 1119, 1121 (9th Cir. 1973). Defendant's position that this juror's statement was the kind of clear and incontrovertible evidence of incompetence permitting further inquiry is untenable. See *United States v. Dioguardi*, 492 F.2d 70 (2d Cir. 1974), *cert. den.*, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53.

### III. APPLICATION OF THE DANGEROUS SPECIAL OFFENDER STATUTE

After the defendant was indicted and before the defendant was tried, the government filed a petition against the defendant under 18 U.S.C. § 3575, entitled: "Increased sentence for dangerous special offenders," Title X of the 1970 Omnibus Crime Control Act. The petition alleged that the defendant was a special offender within § 3575(e)(1) on the basis of prior felony convictions;[2] the government offered to prove numerous allegations in support of its claim that the defendant was a dangerous offender under § 3575(f).[3]

**2.** The defendant was convicted in the Circuit Court of Cook County, Illinois in March, 1968 for theft, for which he was given probation, and in November, 1969 for robbery, for which he was sentenced to imprisonment for one to two years. The defendant was imprisoned and released on July 28, 1971.

**3.** Subsection (f) provides: "A defendant is dangerous for purposes of this section if a period of confinement longer than provided for such felony is required for the protection of the public from further criminal conduct by the defendant." The government presented the following information: On August 8, 1974, the defendant negotiated for the sale and delivery of four kilograms of cocaine to be brought in from Florida, and an undisclosed quantity of hashish and marijuana to be brought in from Jamaica. On August 8, 1974, he had in his possession a counterfeit $20 bill and negotiated with an undercover agent for the sale of $100,000 of the same. On August 28, 1974, Neary offered to sell five stolen dishwashers to an undercover federal agent which he stated he had stolen from a warehouse in Chicago. A subsequent search of the defendant's garage by state officials disclosed the five stolen dishwashers. On June 11, Neary and several other individuals hijacked a delivery truck at gun-

point in Chicago; the truck driver was found bound and gagged in his empty truck in Evergreen Park, Illinois. Miscellaneous shipments worth $11,000 were stolen. On March 17, 1975, while awaiting trial in the instant case, Neary was arrested in Ohio in possession of a stolen motor vehicle, two handguns and a silencer. He and his companion were destined for Pittsburgh, Pennsylvania where they were to murder an individual in exchange for $10,000.

The defendant moved to strike the petition on the grounds that the provisions of the dangerous special offender statute were unconstitutional. The defendant claimed that the statute violated his right to indictment by a grand jury and requirement of proof beyond a reasonable doubt, and that the statute lacked any standards to guide the discretion of the prosecutor in seeking the application of the statute or to guide the court in deciding when to apply the statute. The defendant further alleged that the language of the statute relating to dangerousness was vague and indefinite and inadequate as a standard for increased punishment, and that any sentence imposed without a meaningful standard is cruel and unusual punishment.

The court deemed defendant a special offender under (e)(1), on the basis of his previous convictions and incarceration. The court found defendant dangerous under (f), basing its finding on testimony of government agents that the defendant had negotiated with them for the sale of cocaine, although no narcotics were ever produced by the defendant; on the fact that defendant had breached a condition of bail during pendency of the instant charge by leaving the jurisdiction of the court, resulting in an increase in bail and the issuance of an arrest warrant to bring the defendant back within the jurisdiction; and that the defendant was in custody of another jurisdiction on a completely different charge. An additional factor cited by the court in its finding of dangerousness was the similarity of conduct involved in the instant offense and the conduct testified to by government agents in the negotiation for the sale of cocaine. Specifically the court noted common characteristics of cross-country travel and large quantities of money. The court recognized a penchant in the defendant for acquiring large amounts of money illegally and the defendant's disposition to continue such dealings despite repeated failures. The court sentenced the defendant to ten years and one day imprisonment.[4]

Defendant challenges his increased sentence under the dangerous special offender statute as unconstitutional.[5]

The district court conducted hearings and granted defendant partial relief. The court eliminated portions of the government's petition which stated indictable offenses, on the theory that consideration of such evidence by the court would violate the Fifth Amendment guarantee that no person shall be tried for infamous crimes except upon presentment of indictment by grand jury. Thus the finding of dangerous was based on the information set out in the body of this opinion. We intimate no opinion that the elimination of indictable offenses is necessary for legitimate application of the statute.

4. After finding dangerousness, the court noted that the increased sentence under § 3575(b) should be proportionate to the maximum term otherwise authorized by law for the instant conviction. The court observed that over a

Under § 3575(a) the government may file a notice that defendant is a dangerous special offender subject to sentence under (b), with a twenty-five year maximum. Under (b), after conviction and prior to sentencing, the trial court, sitting without a jury, conducts a hearing to determine whether the defendant qualifies as a dangerous special offender under the criteria specified in the statute. The court may consider any information presented at the trial on the underlying felony, at the sentencing hearing, or contained in the pre-sentence report. Once the factual determinations of special and dangerous have been found by a preponderance of the information considered, the court may impose sentence upon the defendant to a maximum of 25 years, but not disproportionate in severity to the maximum term otherwise authorized.

Special offender status may be determined under any one of the following three categories of § 3575(e):

"(1) the defendant has previously been convicted in courts of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof for two or more offenses committed on occasions different from one another and from such felony and punishable in such courts by death or imprisonment in excess of one year, for one or more of such

substantial period of time in the Northern District of Illinois, sentences of somewhat less than four years had been imposed for the offense of concealing and disposing of stolen securities. Applying an algebraic calculation the court compared the maximum sentence of ten years under 18 U.S.C § 2315 with the maximum sentence of 25 years under § 3575, and decided that a sentence of ten years would be accordingly proportionate to the sentence which normally would have been imposed under § 2315. We do not regard similar exact calculation necessary for legitimate implementation of the statute.

5. The maximum imprisonment prescribed for the specific offense by 18 U.S.C § 2315 is ten years. The sentence exceeded that by one day.

convictions the defendant has been imprisoned prior to the commission of such felony, and less than five years have elapsed between the commission of such felony and either the defendant's release, on parole or otherwise, from imprisonment for one such conviction or his commission of the last such previous offense or another offense punishable by death or imprisonment in excess of one year under applicable laws of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency or instrumentality thereof; or

"(2) the defendant committed such felony as part of a pattern of conduct which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise; or

"(3) such felony was, or the defendant committed such felony in furtherance of, a conspiracy with three or more other persons to engage in a pattern of conduct criminal under applicable laws of any jurisdiction, and the defendant did, or agreed that he would, initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or conduct, or give or receive a bribe or use force as all or part of such conduct."

In addition to finding that the defendant is a special offender, the court determines whether the defendant is also a dangerous offender.

A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant. 18 U.S.C § 3575(f).

The constitutionality of this statute has been upheld as an enhanced sentencing procedure, analogous to recidivist statutes. *United States v. Stewart*, 531 F.2d 326 (6th Cir. 1976), *cert. den.*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376; *United States v. Holt*, 397 F.Supp. 1397 (N.D.Tex.1975), *modified on ground not relevant here, United States*

*v. Bailey*, 537 F.2d 845 (5th Cir. 1976). This view was rejected in *United States v. Duardi*, 384 F.Supp. 874 (W.D.Mo.1974), *aff'd on other grounds*, 529 F.2d 123 (8th Cir. 1975), in which the court held that application of the statute extends beyond ordinary sentencing procedure and is violative of due process.

■ Under the usual sentencing procedure, the court may consider many factors in determining the type and length of sentence. A sentencing judge is not limited to information presented in open court by witnesses under oath, but may exercise wide discretion in receiving information on which to base a sentencing decision. *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949).

If we were to regard Title X as a revision of the Criminal Code whereby, as to any violation of Title 18 for which the formerly prescribed maximum was less than 25 years, the maximum had been increased to 25 years, consideration of the matters enumerated in § 3575 would fall clearly within the normal sentencing structure. That is, if the history and language of § 3575 would support a construction that Congress had declared every offense for which a maximum of less than 25 years had previously been provided, now potentially punishable by a sentence of 25 years, then the findings of special and dangerous would be guidelines to structure the discretion of the judge in sentencing a convicted offender. Under this interpretation, all elements of the offense meriting a possible sentence of 25 years would have been established beyond a reasonable doubt with the right to a jury trial. Judicial findings of special and dangerous to a preponderance of the evidence would involve considerations of factors routinely examined by a judge in sentencing, including past convictions, likelihood of future offenses, and the safety of society. However, such legislative intent cannot be inferred from the language of § 3575.

■ Under the present language, it seems clear that the maximum specified in the statute defining the offense is still the maximum for all cases unless separate and

further factual determinations are made under § 3575. Additional factual determinations of "special" and "dangerous" must be made after a verdict of guilty to support the imposition of a sentence greater than the sentence normally applicable to the crime. The necessity of additional findings of fact which potentially subject the defendant to increased incarceration raises the questions of due process argued by defendant as not inherent in the ordinary sentencing procedure.

Defendant argues, in part, that subsection (b) of the statute denies due process because the findings (of special offender status and of dangerousness) on which an increased sentence must be predicated may be based on a preponderance of the information considered and need not be established beyond a reasonable doubt. He contends that since these findings expose a defendant to substantially increased confinement, such findings must be supported by proof beyond a reasonable doubt, and he cites *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *United States ex rel. Stachulak v. Coughlin*, 520 F.2d 931, 935 (7th Cir. 1975); note, *Recidivist Procedures*, 40 N.Y.U.L.Rev. 332, 341–43 (1965). He also argues that the Sixth Amendment requires a trial by jury.

Section 3575(b) prescribes the procedure to be followed, requires only that a finding be based on a preponderance of the information considered, and provides for determination by the court without a jury. Subsection (b) applies both to the finding that a defendant is a special offender under (e), and that he is dangerous under (f). Thus at first glance, defendant's challenge to the procedure as a denial of due process would seem to go to both findings. Defendant has, however, conceded on appeal the adequacy of the finding, in his case, that he is a special offender.[6]

■ Based on that concession, we find that defendant is not in a position to challenge the validity of the procedure on which the finding that he is a special offender is predicated, and we need only consider his challenges insofar as they relate to the procedure and standards for, and the finding of, dangerousness.

We make plain, however, that the question of the constitutional validity of the procedure prescribed in § 3575(b) when it underlies a finding that a defendant is a special offender may well be different from the question of constitutional validity of the same procedure when it underlies a finding that a defendant is "dangerous" as defined in § 3575(f). In rejecting (as we do) defendant's due process challenges to the finding that he is "dangerous," we by no means decide the merits of the same challenges to the finding that he is a special offender if that finding were properly before us.

■ We note a marked difference between the type of issue to be decided by a finding of special offender status under § 3575(e) and the type of issue decided by a finding of dangerousness under § 3575(f). The former involves historical facts, either prior convictions (under (e)(1) or the character and concomitants of the offensive conduct (under (e)(2) and (3)). The latter essentially involves both evaluation of the character of the defendant and a prediction of future conduct, matters which are traditionally left to wide discretion of a sentencing court. Because of this difference, we conclude that the essential function of a finding of special offender, under (e), is to expose the defendant to a sentence of imprisonment longer than the maximum prescribed by the statute under which he has been charged and convicted, but not exceeding twenty-five years, and that the essential functions of a finding of dangerousness, under (f), is to determine whether and to

---

6. In the district court he did not concede that he was the person whose previous convictions had been offered, and put the government to its proof. The district court made both its findings expressly on the basis of "preponderance of the evidence." In its brief on appeal, however, defendant says, "No question is present here of the adequacy of the finding that the defendant was a 'special offender' under the recidivist provision of Title X, 18 U.S.C § 3575(e)(1)."

what extent a sentence in excess of the maximum for the particular offense is appropriate.

Particularly with respect to (e)(1), we note that its implementation is analogous to a recidivist statute: determination of prior convictions and imprisonment subjects the defendant to liability of increased punishment for the instant crime. Under a recidivist statute, the finding whether a defendant is a habitual criminal is a determination independent of conviction on the present charge. *Graham v. West Virginia,* 224 U.S. 616, 625, 32 S.Ct. 583, 586, 56 L.Ed. 917 (1912); *see Chandler v. Fretag,* 348 U.S. 3, 8, 75 S.Ct. 1, 4, 99 L.Ed. 4 (1954); *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

Based on the foregoing analysis of the relationship between (e) and (f) of § 3575, *i. e.,* that a finding under (e) exposes the defendant to an increase in maximum to 25 years and that the finding under (f) relates to the determination of the length of sentence within that range, and in the light of our conclusion that defendant in the case before us has no standing to challenge the procedure underlying the finding that he is a special offender under (e) we proceed to consider the challenge to the procedure prescribed by § 3575(b), but only as it relates to § 3575(f).

Once again, comparing § 3575(e)(1) with a recidivist statute, we note that recidivist statutes often require imposition of an increased sentence once the defendant's prior conviction is established. Under § 3575, however, the trial judge retains discretion in sentencing. The court may prescribe increased incarceration if necessary for the safety of society. The factors considered in determining dangerousness are not different from factors normally considered by a judge in the sentencing process, nor is the discretion vested in the trial court any greater than discretion usually exercised in sentencing. Many procedural protections applicable upon trial of guilt or innocence do not apply to the determination of sentence after conviction. The court is not restricted at that stage to information re-

ceived in open court. *Williams v. New York,* 337 U.S. 241, 250–51, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1949).

Nor do we find that the term dangerous is overly broad or vague for purposes of sentencing. *United States v. Stewart,* 531 F.2d 326, 336 (6th Cir. 1976), *cert. den.,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376; *United States v. Holt,* 397 F.Supp. 1397, 1399 (N.D.Tex.1975), *modified on ground not relevant here, United States v. Bailey,* 537 F.2d 845 (5th Cir. 1976), *contra United States v. Duardi,* 384 F.Supp. 874, 886 (W.D.Mo.1974), *aff'd on other grounds,* 529 F.2d 123 (8th Cir. 1975). Factors routinely considered by a sentencing judge are the defendant's past record, the probation officer's report, the nature of the present offense and the defendant's attitude. *United States v. Holt, supra,* at 1399. Likelihood of future criminality and the potential danger to society are determinations implicit in sentencing decisions. The concept of dangerousness as defined in § 3575 is a verbalization of considerations underlying any sentencing decision.

The defendant's contentions that the findings of dangerousness were based on insufficient evidence and were tainted by prejudicial information related by the prosecution are without merit. As set out previously in the margin, the trial judge struck certain allegations from the dangerous special offender petition on the basis that they were indictable offenses and consideration of them in increasing sentence would have denied defendant's right to indictment by grand jury. Even as excised, the record supports the court's conclusion that the defendant would pose a future threat to society and was deserving of an increased period of incarceration. The record discloses that the trial court refused repeated offers of proof made by the prosecutors because of the prejudicial nature of the information.

A further contention of the defendant is that the absence of standards to guide prosecutorial discretion in utilizing the statute violates due process and the

guarantee against cruel and unusual punishment. Since we regard the application of § 3575(e)(1) and (f) to be essentially the same as a recidivist statute, this challenge is laid to rest by *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). Without a claim by the defendant that prosecutorial selectivity has been based on an unjustifiable standard such as race, religion or other arbitrary classification, there is no basis for finding denial of equal protection.

To summarize, we treat, in substance, the determination that a defendant is a special offender, under (e), as a factual determination which exposes him to an increased sentence, up to 25 years, and the determination that he is dangerous, under (f), and therefore should be confined for more than the maximum provided for the offense charged as the exercise of discretion traditional in sentencing. Although noting the existence of serious due process questions as to the determination under (e) by the procedure described in (b), we do not reach these questions because of defendant's concession as to the adequacy of the finding that he is a special offender. We find no lack of due process in the procedure for the finding that he is dangerous under (f), and in fixing his sentence in excess of the maximum prescribed for the offense charged.

Defendant's contention that the sentence imposed is so disproportionate as to be cruel and unusual punishment is insubstantial: the sentence is but a day greater than the maximum sentence authorized for the underlying felony. *Cf. Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973).

The judgment is AFFIRMED.

PELL, Circuit Judge, concurring.

I concur in the result reached in the opinion authored by Chief Judge Fairchild. Insofar, however, as that opinion is subject to being read as containing an inference that this court is expressing an opinion on the question of constitutional due process in the determination of special offender status under 18 U.S.C § 3575(b), I do not concur.

My lack of concurrence is not intended to express either agreement or disagreement with the scholarly analysis of the question of due process applicable to the determination of special offender status. It simply is that the precise issue, not briefed or argued in this court, is a complex one, intertwined as it is with the entire matter of sentencing, and from my point of view should not have been addressed at all in the present case.